Van Vorst, J.
The defendants are a corporation created by chapter 111 of the Laws of 1877. By section 2 of the act the defendant was authorized to receive on deposit, as bailee, for safe keeping and storage, jewelry, plate and other articles of personal property, specially described, for such compensation as might be agreed upon, and also to let out vaults and safes and other receptacles for the uses and purposes of the corporation.
On the 20th of July, 1873, the plaintiff hired, for the period of one year, one of the defendant’s safes. A key to the safe was given to her, and only she, or her husband, as her substitute, had any right of access to it. On the 15th of October, 1873, the plaintiff had on deposit, in a tin box in the safe, §9,050 in money, thirteen United States 5.20 bonds of $1,000 each, four Western Union Telegraph bonds, and other bonds and securities, in all of the value of §10,000 and upwards.
On that day Jeremiah Petty, a captain of the police of the fifth precinct of the city of New York, charged with the execution of a search warrant, issued by John K. Hackett, the recorder of the city of New York, directing a search to be made of the box of the plaintiff, as also the box of her husband, Andrew L. Roberts, and one Valentine Gleason presented himself at the place of business of the defendants, and, exhibiting his warrant, demanded admission to the defendant’s vaults, and access to the boxes in question.
*508 In these boxes, as the warrant charged, were concealed, as was supposed, certain United States 5.20 bonds, and other bonds stolen from the third national bank in the city of Baltimore.
The warrant directed the officer charged with its execution to bring the property described in the warrant, when found, before the officer issuing the same. Officer Petty was accompanied by two other persons connected with the Police department.
The entrance to the vaults in which the boxes or safes were situated, was guarded by strong iron doors, of which the defendant and its servants had exclusive control. Entrance through these doors was refused by the officers of the defendant. Officer Petty, insisting upon his legal right to enter under the search warrant, clearly stated his determination to go in through the door to the safes.
After some parley the door was opened by the defendant’s servants, and the officer with his assistants entered, and by force, and with tools and instruments in their possession, broke open the plaintiff’s safe, as also the safes of her husband and Gleason, against the remonstrances and protests of the officers of the defendant. Petty and his assistants opened the tin box which they found in the plaintiff’s safe, and took therefrom and carried away the bonds, money and securities which they found therein, and delivered the same the next day to the district attorney of the city of New York. None of the property taken from the plaintiff’s box, with the exception perhaps of the United States 5.20 bonds, was described in the search warrant. It is urged on the plaintiff’s behalf that the defendant, in violation of its duty to her, suffered her safe to be broken open and its contents carried away, and that it is hable to her for the value of her property.
The twelfth rule of the company, which was brought to the knowledge of the plaintiff at the time she hired the safe, limits the defendant’s liability “to the diligent and faithful performance of their duty by the officers and employees of the company.”
In Jones v. Morgan (90 N. Y., 4, 9), Earl, J., in speaking of the case in which one hires a box in the vault of a safe deposit company, of which the person renting keeps the key, that the company, without special contract to that effect, “would be held to at least ordinary care in keeping the deposit,” and that the “ obligation to discharge it could be implied from the relation between the parties. ”
A higher degree of care and responsibility for the absolute safety and return of property specifically deposited with the defendant as a bailee for an adequate reward may *509 naturally arise than for the safety of the contents of a safe hired by a person, and of which it is ignorant.
But notwithstanding the fact that the moneys and bonds of the plaintiff were not specially deposited with it as a bailee, yet its duty to the plaintiff obliged the defendant to guard her safe and its contents against the approach or attack of others who had no legal right to open it or to interfere with its contents. Any negligent omission of reasonable care in this regard, any failure to supply proper means and agencies to protect and guard the property against illegal approach, would be a breach of duty and obligation to the plaintiff as a hirer of the safe.
And this, although the defendant did not know before the 15th day of October, 1873, and after the box had been broken open, what, if anything, it contained.
But the defendant was under no obligation to resist the execution of the search warrant, issued by the recorder of the city of New York.
When the officer demanded admission to the vault of the company and to the safe of the plaintiff, under the search warrant, it was the duty of the officers of the defendant to yield. They hesitated, as the evidence shows, and to the extent that they yielded they did so protesting. But opposition, as it would have been illegal, would also have been useless and would have led to the arrest of the persons in charge of the vaults or to violence and breach of the peace. Crocker on Sheriffs, § 80; Bell v. Clapp, 10 Johns. R., 263.
Even under an attachment in a civil suit, the right of an officer charged with its execution to enter premises of a “ safe deposit company,” and to make a seizure, is recognized. United States v. Graff, 67 Barb., 304. In that case the sheriff was directed to “ open the safe and tin box” containing the property sought to be attached.
It is quite true that the money of the plaintiff, and a large part of the other property taken by the officers of the law under the search warrant, was not described therein. But as to the United States bonds of the 5.20 issue, although not described by their numbers in the warrant, yet they were of the general character of those mentioned, and the officers were probably justified in taking them.
But it is quite clear that having broken open the boxes and removed the contents, they had made up their minds to take away all the contents, whether described or not, and to deliver the same to the district attorney, to be disposed of by him according to the rights of the parties under the charges made upon which the warrant had been issued by the recorder.
Officer Petty testified as to his action in this respect as follows: “It would not do for me to leave these securities *510 that were in that box open and loose and allow any one to touch them. After I had opened the boxes, of course. if there was anything gone, I could have been blamed for it, and I was not going to take that chance.”
To the question : “Do you mean to say you would take everything in the box, although not described in the warrant ?”
A. “ After breaking it open I considered myself bound fosee that the property was properly delivered to the authorities and let them dispose of it. These boxes I had broken open, and it would not have done for me to have gone-away, and left the contents of the boxes there.”
The president of the defendant, and who represented it, did not know until afterwards, although a list of the property found in the plaintiffs box had been made by one of its clerks, what property the officers of the law had taken from the box.
He protested, however, against the taking away of the-property. This, I conclude, is all he could have been reasonably called upon to do. For the excess of authority exercised by the officers executing the search warrant, in taking property not mentioned therein, the defendants are not necessarily liable.
This property had not been specifically deposited with them by the plaintiff. It was taken by the officers of the-law from the plaintiffs safe, in which she had placed it without the defendant’s knowledge, and they were not-called upon by any duty or obligation to the plaintiff to enter into a physical struggle with the officers of the law to take into their possession property which had not been distinctly deposited with them, and to incur responsibilities with regard to it without the plaintiff’s consent.
There is some dispute as to how long this property remained in the custody of the district attorney. Mr. Allen, the assistant of the district attorney, says it was in the safe of the district attorney so long as he remained in the office —some eleven months.
While in the possession of the district attorney, and within a day or two after its receipt by him, the property was attached in civil actions, to which the plaintiff was a party defendant. A list of the property in his possession was given by the district attorney to the attaching officer.
The deputy sheriff, who served the attachments, testified that he took the property into his possession shortly after he served the attachments, in October, 1873, and he claims to have sold the same under executions issued upon judgments recovered in the actions in which the attachments were issued.
The fact that the sheriff sold the plaintiff’s property *511 under such executions, and applied the proceeds of the sales, to the satisfaction of judgments against the plaintiff is disputed by her. In that connection it is insisted by her learned counsel that the action of the deputy sheriff under the attachments and executions was dishonest and illegal; that he sacrificed the property through fraudulent sales thereof, and, in effect, converted to his own use the property or its proceeds. •
In the view I am led to take of this action and the defendants’ liability, it is not important to scrutinize closely the conduct of the sheriff under the executions which came into his hands upon judgments against the plaintiff, after the service of the attachments and the seizure thereunder.
I accept the statements of the assistant district attorney that after the service of the attachments, in October, 1813, the property yet remained in the safe of that officer for a. period of more than eleven months before the sheriff took it into his actual possession.
But the service of the attachments must be regarded as placing the property in custodia legis, and the defendant is not responsible for the loss or misapplication of it—if it was in fact lost, misapplied or converted by the sheriff or his officers. And this, although it might in any light be considered that the defendant had been to any extent remiss in the performance of its duty to the plaintiff, as its failure to-resist the officers of the law in their taking away the property under the search warrant, as the subsequent loss and conversion of the property by the sheriff or his deputy was not a necessary consequence of the supposed negligence of the defendant.
The levy and seizure under the attachments, in actions against the plaintiff, must in the law be regarded as a restoration of the property to the plaintiff, or the placing the same within her control, at least in so far as the defendant is concerned. Kelley v. Shed, 10 Metc., 317. In that case the defendant, an officer charged with the execution of a search warrant, took goods from the plaintiff’s possession not specified in the warrant. He was a trespasser, as the court decided. But the goods were attached in the hands of the defendant. The property, as the court held, thus passed into the custody of the law by legal process which the defendant could not resist or control. The court said: “The plaintiff’s case assumes that the goods were his property. They were attached as his. If the creditor recovers judgment and takes them in execution, they go to pay his debt, if not, they are laid up in the custody of a responsible officer of the law, for his use, to be delivered on demand.”
In Montgomery v. Wilson (48 Vt., 616) the defendants *512 were sued for a trespass in taking and driving away the plaintiff’s cattle; but the cattle were taken from the possession of the trespasser by the sheriff on writs of attachment. The court held that “the sheriff on talcing the property on the writs in his hands, as he officially might and did, became ' solely responsible to the parties entitled under the attachment for nis course in respect to the property after it had been taken by him. These defendants are not chargeable for his course as an officer of the law.” Whitaker v. Merrill, 28 Barb., 526; Stamford Steamboat Co. v. Gibbons, 9 Wend., 327, at p. 331.
' Nor does the fact that the attachments, or some of them, were subsequently set aside, or that the judgments, or some of them, were reversed, give or sustain a cause of action. If the attachments were set aside the property, if not disposed of by the sheriff, would be restored to the plaintiff. Such restoration could have been compelled by her.
Plaintiff’s claim against the defendants is not for a conversion of the property, but that it negligently suffered it to be taken away by trespassers. But if by operation of law the property afterwards came for any length of time under the plaintiff’s control, that would end the defendants’ liability for the value of the property. And this notwithstanding that the process which subjected the property to her control, or held it for her benefit, was afterwards set aside. Day v. Bach, 87 N. Y., 56.
If the attachments were in fact set aside it was done presumably upon her application, and she could in. the same proceeding ask for a restoration of the property.
But it is also urged on the behalf of the plaintiff that the defendants were guilty of a gross breach of duty in not notifying her of the seizure of her-property by the officer under the search warrant.
Good faith undoubtedly called for the giving of notice that her box had been broken open and her property taken away; and if no notice was given, so that the plaintiff might protect herself against the wrongful taking away of her property by others, the defendant would be liable for all damages, the consequence of a failure to give such notice.
But the answer to that suggestion is found in the fact that the property in the end came into the custody of the law under the attachment, and for its treatment thereafter, for its actual waste or conversion by the officers of the law or others, the defendants are not responsible;
But upon the subject of notice, it may be said that the issuing and service of the attachment, in actions to which the plaintiff was a party, must be considered as a notice to her. She appeared in the actions.
These attachments, or some of them, were served in *513 October, 1873, within a few days after the seizure under the search warrants.
Mr. Arnold, the attorney for the plaintiff in one of the actions in which the property was attached, testified that the property claimed by the plaintiff was seized under the execution in that case. That she made a claim that it was her property. The sheriff asked for an indemnity, which was not given, and that the property was not sold under his execution.
In addition to this, within fifteen or twenty days after the seizure by the officers under the search warrant, A. Oakey Hall called upon the defendants, on behalf of the plaintiff, and said that he wanted to examine the safes. As evidence of his authority he handed to the president of the defendant a paper signed by the plaintiff, in the words:
New Yobk, November 10, 1873.
Hr. A. Oakey Hall is constituted our attorney to examine any entries and papers connected with, the deposits of boxes in Stuyvesant Safe Deposit Company, which papers said company have.
(Signed.) ANDREW L. ROBERTS.
V. GLEASON,
LYDIA J. ROBERTS.
The president of the company told Mr. Hall that they had nothing there belonging to the plaintiff; that the boxes with their contents were taken away “under the authority of Judge Haokett’s court.” Mr. Hall replied: “That is all I have got to do—to notify them.”
The terms in which Mr. Hall’s authority is expressed are only reconcilable with the idea that the three persons whose boxes were directed to be searched, including the plaintiff, had actual knowledge that these boxes had been entered by the officers—hence their direction to him to examine the papers which the company had, and a notice to Mr. Hall was a notice to the plaintiff.
The plaintiff’s husband, who had access to the box, under her appointment, was also advised of the same facts before the property was disposed of by the sheriff. There is no reason why the plaintiff, if entitled to the possession of this property as against the sheriff, the legal custodian under the attachment, could not have enforced her right, through an appropriate action, long before it was sold or disposed of by the sheriff.
As late as August, 1875, n'early two years after he had attached the property, it remained in the hands of the sheriff. Claiming then to hold the same under executions issued upon judgments in actions in which the attachments were issued, he deposited the property with the National Trust Company.
*514 The sheriff received the property again from the National Trust Company on the 4th day of August, 1875, and sold or professed to sell the same at auction, under executions, in his hands.
With knowledge therefore that this property was in the hands of the officers of the law, under one or more attachments or executions, plaintiff should have instituted appropriate proceedings to recover the same into her actual possession, and the loss to her from any misconduct of the sheriff is the result of the omission on her part to take proper steps, at the proper time, to regain the possession of' the property, if she was legally entitled to it, from the only person, who having it in his actual possession, was responsible to her for its safety.
The property was taken from the possession of the defendant under the search warrant on the 15th day of October, 1873. The suffering it to be taken on that day constitutes the plaintiff’s cause of action. This action was not, however, commenced until the 14th day of October, 1879.
Whilst this delay is no legal answer to this action, it does afford some reason to believe, in the absence of any proof of a previous demand, that the plaintiff had no fixed idea, until the day before the Statute of Limitations would have' in duty constituted a good defense, that she had any claim against the defendant.
Upon the whole case the plaintiff’s case must be disr missed, with costs. __